UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

STC FIVE, ET AL                                               CIVIL ACTION

VERSUS                                                        No. 09-3163

MUDBUGS WEST BANK                                             SECTION I
DEVELOPMENT CORPORATION,
INC.

# ORDER

The plaintiffs, STC Five LLC ("STC") and Global Signal Acquisitions II LLC ("GSA"), have filed a motion for partial summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1] The defendant, Mudbugs West Bank Development Corporation, Inc. ("Mudbugs") has filed an opposition.[2] For the following reasons, the motion is **DENIED.**

## *BACKGROUND*

The above-captioned case involves a lawsuit by a lessee, STC, and its "exclusive agent and attorney-in-fact,"[3] GSA, against a lessor, Mudbugs, for breach of contract under Louisiana law. The plaintiffs request damages as well as specific performance or, alternatively, declaratory relief.[4] Only the claim for the breach of the lease agreement is at issue in this motion for partial

---

[1]R. Doc. No. 37.

[2]R. Doc. No. 36.

[3]R. Doc. No. 1, p. 4.

[4]*Id*. at p. 1.

summary judgment.[5]

STC is a corporation in "the business of owning, using, and leasing communications tower facilities."[6] On December 7, 1996, STC's predecessor-in-interest, Sprint Spectrum Limited Partnership ("SSLP"),[7] entered into an agreement with Mudbugs to lease a parcel of land that is part of a larger parcel of property that Mudbugs owns at 2404 Belle Chasse Highway, Gretna, Louisiana.[8] The lease agreement provided that the lessee could "make such improvements on the Site as it deems necessary from time to time for the operation of a transmitter site for wireless voice and data communications."[9] SSLP subsequently built a communications tower facility on the leased premises.[10]

Plaintiffs state that STC currently owns and operates the communications tower on the leased property.[11] According to plaintiffs, GSA manages the leased property for STC as its agent and attorney-in-fact.[12] Plaintiffs state that GSA is a subsidiary of Crown Castle International Corporation ("Crown International") and an affiliate of Crown Castle USA, Inc. ("Crown USA").

---

[5] R. Doc. No. 37, p. 1.

[6] R. Doc. No. 1, p. 3.

[7] *Id.* at p. 1.

[8] *Id.* at p. 3; R. Doc. No. 1, Ex. A.

[9] R. Doc. No. 1, p. 3; R. Doc. No. 1, Ex. A, ¶ 7. The term of the lease agreement is five years with four automatic renewals for terms of five years each. *Id.* at ¶ 2.

[10] R. Doc No. 1, p. 3.

[11] *Id.* at p. 4.

[12] *Id.*

The lease agreement includes a provision allowing for assignment or sublease as follows:

> SSLP will not assign or transfer this Agreement or sublet all or any portion of the Site without the prior written consent of Owner, which consent will not be unreasonably withheld, delayed, or conditioned; provided however, SSLP may assign or sublet without Owner's prior written consent to any party controlling, controlled by or under common control with SSLP or to any part which acquires substantially all of the assets of SSLP.[13]

The plaintiffs claim that from October 2007 through October 2008, representatives of GSA, Crown USA, and Crown International communicated with and/or attempted to communicate with Michael Fitzpatrick ("Fitzpatrick"), the president and co-owner of Mudbugs, to secure his consent to certain subleases.[14] Plaintiffs state that on November 29, 2007, GSA, on behalf of STC, entered into a sublease agreement with Clearwire LLC ("Clearwire") pursuant to which Clearwire agreed to pay $15,000 per year for a minimum of five years to collocate equipment on STC's communications tower, subject to STC obtaining consent from Mudbugs for the collocation.[15] In addition, at some time prior to March 2008, plaintiffs state that GSA entered into negotiations with T-Mobile for T-Mobile to collocate on the communications tower for a rental fee of $1,700 per month for a minimum of five years.[16]

The various written communications that plaintiffs' representatives sent to Fitzpatrick and the Mudbugs property manager, Ethel Cantu (Cantu"), are documented in the record. In a

---

[13]R. Doc. No. 1, Ex. A, ¶ 5.

[14]R. Doc. No. 1, pp. 4-8.

[15]*Id*. at p. 4.

[16]*Id*. at p. 5.

letter dated October 10, 2007, Tracey Barton ("Barton"), a Crown USA property specialist, wrote Fitzpatrick requesting his consent to lease space to Clearwire. The letter stated that "[t]he sublease will not alter the character or use of the site nor will it change the nature of either GSA's or [SSLP's] occupancy of the site."[17] Barton subsequently sent a copy of this letter to Cantu dated October 22, 2007.[18]

The plaintiffs claim that on December 3, 2007, Barton spoke to Fitzpatrick, "who demanded money in exchange for the consent of Mudbugs, in amounts ranging from $8,000 to over $15,000, and said that Mudbugs would not consent to the [sublease] without being paid additional money."[19] Mudbugs does not deny that Fitzpatrick may have made this request and it suggests that Fitzpatrick made such demand because Barton told Fitzpatrick that GSA had already entered into a sublease agreement with Clearwire.[20] Fitzpatrick states in an affidavit, "My initial request for $8,000 to $15,000 in exchange (if in fact such request was made) for the consent to sublease was made without any frame of reference and at no time did any representative of Crown Castle advise me that the request was unreasonable."[21]

Julian Perry, another Crown USA property specialist, sent a letter dated March 12, 2008 to Fitzpatrick requesting his consent to sublease the property to T-Mobile. This letter similarly stated that "[t]he sublease will not alter the character or use of the site nor will it change the

---

[17] R. Doc. No. 1, Ex. B.

[18] *Id.*, Ex. C.

[19] R. Doc. No. 1, p. 5.

[20] R. Doc. No. 46, p. 7.

[21] *Id.*, Ex. 14, p. 2.

4

nature of Lessee's occupancy of the site."[22]

Plaintiffs state that on or about April 30, 2008, Carter Sanderford of Crown International[23] ("Sanderford") emailed a letter setting forth two proposals to induce Mudbugs to grant consent to the proposed subleases: "(1) paying a lump sum of $165,000 for a 'perpetual easement' and an assignment of Mudbug's interest in the lease; and (2) extending the lease for 30 years, removing the lessor consent requirement, and paying a modification signing bonus of $5,000."[24] The letter advised Mudbugs that "**Crown Castle urgently needs to extend your lease now**."[25]

Sanderford states in an affidavit that on May 7, 2008, he spoke with Fitzpatrick who stated that the "proposal for the perpetual easement was ridiculous." Sanderford states in the affidavit, "I asked for a counteroffer and [Fitzpatrick] said that he would get back to me."[26] Sanderford relays that on June 2, 2008, "I spoke with Fitzpatrick and he said that he wanted a $300 per month increase in the rent."[27]

Plaintiffs state that on or about June 3, 2008, Sanderford emailed a letter to Fitzpatrick offering three proposals; "(1) paying a lump sum of $185,000 for a 'perpetual easement' and an

---

[22] R. Doc. No. 1, Ex. D.

[23] The plaintiffs identify such individual as "Carter Sanderford of Crown USA," R. Doc. No. 1, p. 6, but the attached exhibit, *see id.*, Ex. E, is a letter signed by "Carter Sanderford[,] Crown Castle International."

[24] R. Doc. No. 1, p. 6.

[25] See R. Doc. No. 37, Ex. 5 (emphasis in original).

[26] R. Doc. No. 37 Sanderford Declaration, p. 2.

[27] *Id.*

5

assignment of Mudbug's interest in the lease; or (2) extending the lease for 20 years, removing the lessor consent requirement, and increasing the rent by $250 per month; or (3) in conjunction with the second option, replacing the current 15% escalation in rent every five years with a provision that would escalate the rent annually, based upon the consumer price index, and paying [a] $2,000 modification signing bonus."[28] The letter similarly advised Mudbugs, that "**Crown Castle urgently needs to extend your lease now**."[29]

Grace Schuster of Crown USA, whom defendant alleges to be a paralegal, sent a legal opinion letter dated August 22, 2008 to Fitzpatrick requesting his consent to the Clearwire and T-Mobile subleases and stating that his consent was required under Louisiana law.[30] Schuster later sent Fitzgerald a similar letter dated October 8, 2008.[31] Plaintiffs claim that on October 12, 2008, Neil Cikins, a corporate attorney with Crown USA spoke to Fitzpatrick, who "said he was ready to litigate the consent issue."[32]

STC filed this lawsuit claiming that Mudbugs' refusal to grant consent to STC to sublease to Clearwire and T-Mobile constituted "an unreasonable withholding, delaying, or conditioning of consent in breach of the Lease Agreement."[33]

---

[28]*Id*.

[29]See R. Doc. No. 36, Ex. 6 (emphasis in original). Sanderford later sent a letter to Fitzpatrick, dated July 22, 2008, offering the same proposals stated in the June 3, 2008 letter and similarly advising Mudbugs that Crown Castle needed to extend the lease immediately. R. Doc. No. 1, p. 7; R. Doc. No. 36, Ex. 7.

[30]R. Doc. No. 1, p. 7; R. Doc. No. 37, Ex. 9

[31]R. Doc. No. 1, p. 7.

[32]*Id.*

[33]*Id*. at p. 8.

In an affidavit attached to the defendant's opposition, Fitzpatrick stated that although he had no specific recollection of the above conversations described by plaintiffs, he did "not deny that the [plaintiff's descriptions] may accurately reflect the substance of those conversations."[34] Fitzpatrick states that, prior to this litigation, the plaintiffs never provided him with " the specifics of the proposed sublease rentals to Clearwire, LLC or T-Mobile, nor was I ever provided with a copy of the proposed subleases. Whenever I inquired of Crown Castle's representatives into the amount of sublease rentals they were demanding from sublessees, the information was not provided to me."[35]

## *LAW AND ANALYSIS*

### I. STANDARD OF LAW

Summary judgment is proper when, after reviewing "the pleadings, the discovery and disclosure materials on file, and any affidavits," the court determines there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. Celotex, 477 U.S. at 323; Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden pursuant to Rule 56(c), the

---

[34]R. Doc. No. 46, Ex. 14, p. 1.

[35]*Id*. at p. 2.

other party must come forward with specific facts showing that there is a genuine issue of material fact for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The non-moving party must carry this burden as to each essential element on which it bears the burden of proof. Schaefer v. Gulf Coast Regional Blood Center, 10 F.3d 327, 330 (5th Cir. 1994). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party responding to the motion for summary judgment may not rest upon the pleadings, but must identify specific facts that establish a genuine issue. Id. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." Id. at 255; see Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

## II. SUBLEASE LAW

Article 2713 of the Louisiana Civil Code addresses a lessee's right to sublease, assign or encumber, providing:

> The lessee has the right to sublease the leased thing or to assign or encumber his rights in the lease, unless expressly prohibited by the contract of lease. A provision that prohibits one of these rights is deemed to prohibit the others, unless a contrary intent is expressed. In all other respects, a provision that prohibits subleasing, assigning, or encumbering is to be strictly construed against the lessor.

8

La. Civ. Code Ann. Art. 2713 (rev. 2004).[36]

"When a lease contains the requirement that lessor's consent is required to sublease with no limitation, the lessor's right to refuse will be protected unless the lessor has abused that right." *Truschinger v. Pak*, 513 So.2d 1151, 1154 (La. 1987). When a lease provides that the lessor's consent to assign the lease may not be unreasonably withheld, "the lessor's right to refuse will be judicially protected unless the lessor's refusal was unreasonable." *Id*. "[W]ithholding consent is 'unreasonable' where there are no 'sufficient grounds for a reasonably prudent business person to deny consent.' " *La. Casino Cruises, Inc. v. Capitol Lake Props., Inc*., 845 So.2d 447, 450 (La. App. 1st Cir. 2003)(quoting *Caplan v. Latter & Blum, Inc*., 468 So.2d 1188, 1191 (La. 1985)).

As the Fifth Circuit explained in *Tenet Healthsystem Surgical, L.L.C. v. Jefferson Parish Hosp. Serv. Dist. No. 1*.:

> These rules have been applied in few Louisiana cases, but the following applications emerge. A lessor may reasonably refuse his consent to a proposed sublease or assignment if the proposed sublessee or assignee is financially inferior to the present lessee, *La. Casino Cruises*; if the sublessee's activities don't fall

---

[36] Article 2713 of the Louisiana Civil Code states that provisions that limit subleasing are to be strictly construed against the lessor. The accompanying 2004 Revision Comment explains "The third sentence restates the principle of the second paragraph of Civil Code Article 2725 (1870) properly understood. That paragraph provided that "[t]he interdiction [of the right to sublease] . . . is always construed strictly." In derogation of general principles of interpretation, some cases have erroneously construed such interdiction against the lessee. The third sentence of Civil Code Article 2713 (Rev. 2004) corrects this error." Official Comment - 2004, La. Civ. Code Ann. Art. 2713 (rev. 2004).

In the plaintiffs' motion for partial summary judgment, the plaintiffs acknowledge that there may be some dispute over which version of the statute should apply and which rule should properly be applied in this case. In its opposition to the plaintiffs' motion for summary judgment, the defendants do not dispute that the current statute and/ or the rule that "a provision that prohibits subleasing, assigning, or encumbering is to be strictly construed against the lessor" should be applied in this case. Because the defendant has not raised the issue and because resolution of the plaintiffs' motion is not dependent on this issue, the Court will refrain from ruling on it at this time.

9

within the permitted uses in the lease or if the sublessee's use would inhibit the lessor's ability to lease other spaces in the leased property, *Van Geffen v. Herbert*, 439 So.2d 1257 (La. App. 5th Cir. 1983); if the sublessee won't delineate his proposed activities or if the sublease causes the lessor to lose a tenant on the same property, *Fourchon Docks, Inc. v. Milchem Inc.*, 849 F.2d 1561 (5th Cir. 1988). A lessor's refusal to consent to a sublease or assignment will be found to be unreasonable if the reasons given for the refusal are pretextual, *Caplan*, or if the proposed sublessee is identical to the lessee in financial status and proposed use of the property, *Maurin-Ogden-1978 Pinhook Plaza v. Wiener Corp.*, 430 So.2d 747 (La. App. 5th Cir. 1983).

426 F.3d 738, 741 (5th Cir. 2005).

### III. REASONABLENESS OF REFUSAL

The plaintiffs argue that Mudbugs' requests for compensation in return for its consent to sublease are unreasonable under the established law. In cases where leases contain a provision requiring the lessor's consent to sublease, but not a reasonableness requirement, "the lessor's right to refuse will be judicially protected unless the lessor has abused that right." *Truschinger*, 513 So. 2d at 1154. Applying an abuse of rights standard, Louisiana courts have upheld a lessor's attempts to negotiate consent in return for financial gain. In *Truschinger*, the Supreme Court of Louisiana held that a landlord's attempts to condition consent in return for money was permissible where the lease did not contain an unreasonably withholding clause that limited the rights of the lessor. 513 So. 2d at 1154-55.

Mudbugs urges the Court to apply the reasoning in *Truschinger*, but *Truschinger* explains that where a lease contains the provision that the lessor's consent may not be unreasonably withheld, as the lease does in this case, courts should apply a reasonableness standard rather than an abuse of rights standard. *Id*. at 1154. Therefore, *Truschinger* is distinguishable from this case.

10

Although few Louisiana courts have addressed this issue, in *Caplan* the Louisiana Supreme Court considered a case in which a lessor "refused to consent to the sublease in order to negotiate a new lease with [the lessee] on more favorable terms." 468 So.2d at 1191. The court, based on the facts of that case, held that such position was prohibited by the provision in the lease that restrained the lessor from unreasonably withholding his consent. *Id*. In another Louisiana case, *Van Geffen v. Herbert*, the Louisiana Fifth Circuit Court of Appeals suggested in dicta that a lessor's refusal to consent to a sublease in order to extract a $400 increase in rent would be unreasonable. 439 So.2d 1257, 1259 (La. App. 5th Cir. 1983).

In *Tenet*, the Fifth Circuit, applying Louisiana law, looked to treatises and case law outside of Louisiana law for guidance, and held:

> In determining whether a landlord's refusal to consent was reasonable in a commercial context, only factors that relate to the landlord's interest in preserving the leased property or in having the terms of prime lease performed should be considered. Among factors a landlord can consider are the financial responsibility of the proposed subtenant, the legality and suitability of proposed use and nature of the occupancy. A landlord's personal taste or convenience are factors not properly considered. [*See generally* 54 A.L.R. 3d 679, II.B.6.; Restatement of the Law, Second, Property (Landlord and Tenant), § 15.2 and cases cited therein.] Rather the landlord's objection "*must relate to ownership and operation of leased property, not lessor's general economic interest.*" *Economy Rentals, Inc. v. Garcia*, 112 N.M. 748, 819 P.2d 1306 (1991), cited in 54 A.L.R.3d 679.[37]

426 F.3d at 743 (emphasis added).

The relevant case law suggests that, pursuant to the language of the lease agreement entered into in this case, if Mudbugs withheld its consent to the subleases in order to extract a

---

[37]When evaluating whether a landlord is reasonable in refusing to consent to a sublease, the Court applies a "reasonable prudent man" standard and, "in applying that standard, the personal taste and convenience of the landlord should ordinarily not be considered." *Tenet*, 426 F.3d at 743.

11

financial gain for itself, such would be unreasonable. However, Mudbugs gives other numerous, potentially plausible, reasons for its refusal to consent to the plaintiffs' proposed subleases. For example, Mudbugs claims that (1) plaintiffs made numerous, different requests to renegotiate the lease;[38] (2) the requests for consent came from a variety of individuals with different corporate names;[39] (3) Fitzpatrick never received details of the proposed subleases;[40] and (4) the proposed subleases would have exceeded the terms of the existing lease.[41] Given the defendant's other, non-financial justifications, and the inability of the Court at this stage to determine whether such arguments are a pretext, the Court finds that a genuine issue of material fact exists as to why the defendant withheld consent and whether such refusal was reasonable.

Accordingly,

**IT IS ORDERED** that the motion for partial summary judgment is **DENIED.**

New Orleans, Louisiana, February 4, 2010.

**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**

---

[38] *See supra*, pp. 5-6.

[39] *See* R. Doc. No. 46, p. 23.

[40] *See Id.*, pp. 7-8; *Id.*, Ex. 14, p. 2.

[41] For example, the proposed subleases purported to grant "the non-exclusive right for ingress and egress, seven (7) days a week twenty-four (24) hours a day, on foot or motor vehicles, including trucks, and for the installation and maintenance of utility wires, poles, cables, conduits, and pipes, under or along a Twenty feet (20') wide right-of-way extending from the nearest public right-of-way, Belle Chase Highway, to the premises." R. Doc. No. 46, p. 8. Defendant suggests that such provision is not contained in the original lease agreement and it would have constituted an expansion of the existing lease.